Ronnie PAYNE and Ronald
E. Garris, Appellants,

v.

UNITED STATES, Appellee.

Nos. 93–CF–1643, 94–CF–1445.

District of Columbia Court of Appeals.

Argued June 26, 1997.
Decided July 24, 1997.

Joseph R. Conte, appointed by this court, Washington, DC, for appellant Payne.

Shawn Moore, appointed by this court, Washington, DC, for appellant Garris.

Geoffrey Bestor, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher and Thomas J. Tourish, Jr., Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, KING and REID, Associate Judges.

REID, Associate Judge:

Appellants Ronald E. Garris and Ronnie Payne were convicted on two counts of premeditated first degree murder while armed, in violation of D.C.Code §§ 22–2401, –3202 (1989), two counts of assault with intent to kill while armed, in violation of D.C.Code §§ 22–501, –3202; one count each of carrying a pistol without a license, in violation of D.C.Code § 22–3204(a), and possession of a firearm during a crime of violence, in violation of D.C.Code § 22–3204(b).[1] They filed timely appeals challenging their convictions. We affirm.

## FACTUAL SUMMARY

Terence Woodfork, Hezekiah Vaughn, Kenyetta Jeter and Maurice Carey, all good friends, were seated in a Nissan Pulsar automobile, outside the Breezes Metro Club on Channing Street and Bladensburg Road, N.E., on the night and in the early morning hours of March 12 and 13, 1992.[2] While they were sitting and drinking beer in the Nissan Pulsar, they spotted a blue or gray car carry-

---

1. Payne was sentenced to twenty years to life on each of the first degree murder counts, ten years to life on each of the assault with intent to kill counts, two to ten years on the carrying a pistol count and five to fifteen years on the possession of a firearm count, with all sentences to run consecutive to each other.

Garris was sentenced to consecutive terms of twenty years to life on each of the first degree murder counts, ten years to life for each of the assault with intent to kill counts to run concurrent to each other but consecutive to the murder counts, two to ten years for the carrying a pistol count and five to fifteen years on the possession of a firearm count, with the latter two sentences to run concurrent with all the other sentences.

2. Jeter's name also appears in the record as "Jetter."

ing a white female and a black male, later identified as Christine Terry and Preston Coe, approach and park. Terry and Coe got out of the car and walked toward the Metro Club. Soon another car drove up, occupied by two black males. The two black males emerged from their car and eventually stood in front of the Nissan Pulsar and opened fire, killing Vaughn and Jeter, and injuring Carey in the back and arm. At the time the shots were fired, neither Woodfork nor Carey saw anyone else on the street. Later, the police showed Woodfork a photo array and he picked out Garris and Payne as the assailants. He also made an in-court identification of both men.[3] When Carey was shown the photo array by the police, he initially picked out only Coe, the black male who was with the white female. He did not identify Garris and Payne until his testimony during their trial.[4] However, Carey testified that after the shots were fired, he saw both the car carrying the two black males and the one bearing the white female and the black male leave the area. The car carrying the black male and white female departed first.

At the time of the shootings, Officer Stacey Davis was on duty in the Metro Club area. He "heard ... gunshots, stepped to the corner and observed the gunshots." As he ran up Channing Street, he saw a vehicle containing a black man and a white woman moving on the street. He also "observed two black males firing into or onto a vehicle." One was dark ·in complexion and had on a

blue jean outfit, and the other was light-complected and had on an orange muscle sweat shirt with blue jeans.[5] When the men saw the officer, they got into a car and drove away. Officer Davis identified Payne in court as one of the men he had seen shooting into the Nissan Pulsar.[6]

Christine Terry testified at trial that she had known Garris for about nine to ten months prior to March 13, 1992, and Payne for about six months prior to that time. She met both through her then boyfriend, Preston Coe. Earlier on the night of the shooting incident, she saw Garris and Payne sitting in a car. Garris had a 45 millimeter gun in his lap, but she did not see Payne with a weapon. After Terry arrived in the area of the Metro Club, she overheard Coe tell Garris and Payne to put their guns in the trunk of the car before they went into the club. Payne "said no, that the boys in the occupied car [Vaughn, Jeter, Woodfork and Carey] might see where they're putting their guns." She heard Garris say, "we'll try our shootouts on these young niggers behind us.... We'll smoke these young niggers behind us." Coe and Terry left the area. As Coe and Terry were leaving the area, Terry said she "[saw] Ronald Garris in front of the ... blue car ... shooting into it." She did not see Payne with any gun. About half an hour after Coe and Terry reached their apartment, they received a telephone call, and about fifteen minutes after the call Payne and Garris arrived.

**3.** When Woodfork was interviewed by the police on March 13, 1992, he said he could not see who fired the shots. He was subjected to a rigorous cross-examination by Garris' attorney, and acknowledged some differences between the statement he gave to the police on the night of the murders and his grand jury testimony, as well as his trial testimony.

**4.** Carey responded "yes" to Garris's attorney's question, "you identified [the defendants] not because you recognized them from being on the street that night, but because you know they're the defendants in this case, isn't that right?" However, Carey also asserted on cross-examination that he saw the two black males "when they walked past the car." He said, "I seen them when they turned around. It was just a split second before the shots started firing."

**5.** One of the police forms for which Officer Davis provided information, a PD–251, contains a description of one of the assailants as "a black

male, age twenty, height 5' 7" tall, weight 160 pounds, dark complexion, blue jacket and blue pants"; and described the other as "a black male, age twenty, 5' 8" tall, 175 pounds, medium complexion wearing a blue jacket and black pants." In the witness statement which he gave to Officer Pamela Reed, Officer Davis said one black male was "dark complected wearing blue jeans and a blue jacket, and the other medium complected wearing dark jacket and dark pants." Officer Davis told the grand jury that "one male was about a reddish complexion. He was high-yellow complexion."

**6.** Officer Davis told the grand jury that he was not able "to positively identify the people ... [he] saw shooting" into the Nissan Pulsar. The officer was never asked to identify Payne and Garris either from a photo array or from a lineup.

Garris went into Coe's bedroom with Coe, where the two men remained for about twenty-five to thirty minutes.[7] Garris and Payne were arrested approximately one month after they killed Vaughn and Jeter.

## ANALYSIS

### Garris's Ineffective Assistance Of Counsel Argument

Garris maintains that he was denied the effective assistance of counsel. To prevail on this issue, Garris "must show (1) deficient performance by his trial counsel, and (2) prejudice traceable to his trial counsel's deficiencies. The burden is a heavy one because of a strong presumption that defense counsel has rendered reasonable professional assistance." *Zanders v. United States,* 678 A.2d 556, 569 (D.C.1996) (citing *Strickland v. Washington,* 466 U.S. 668, 669, 104 S.Ct. 2052, 2055, 80 L.Ed.2d 674 (1984)). Garris contends that his "trial counsel's illegal drug usage during a serious double homicide trial was outside the boundaries of reasonable professional norms" and his performance not only was deficient but also prejudicial to him. "[T]o prove prejudice he 'must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Zanders, supra,* 678 A.2d at 569 (quoting *Strickland, supra,* 466 U.S. at 694, 104 S.Ct. at 2068).

▆▆▆▆ We have never before decided whether an attorney's drug usage by itself constitutes ineffective assistance of counsel. Both Garris's counsel and the government acknowledge that drug or alcohol usage by an attorney is not *per se* evidence of ineffective assistance of counsel. We agree. Indeed, "under *Strickland* the fact that an attorney used drugs is not, *in and of itself,* relevant to an ineffective assistance claim. The critical inquiry is whether, for whatever reason, counsel's performance was deficient and whether that deficiency prejudiced the defendant." *Berry v. King,* 765 F.2d 451, 454 (5th Cir.1985) (emphasis in original).[8] Garris's *pro se* motion sets forth several conclusory allegations.[9] However, neither those allegations nor the others raised during his D.C.Code § 23–110 (1996 Repl.) hearing, or discussed on appeal, are supported by credible evidence. At the § 23–110 hearing, only two persons testified: Garris's attorney and Kevin Moye, who allegedly saw Garris's counsel, in a pool room, exchange money for packages he presumed to be drugs. Moye offered no testimony regarding Garris's counsel's performance at trial.

After listening to the testimony of Garris's counsel and Moye, and hearing arguments of counsel, the trial court concluded in part:

First of all, the Court was aware of the problem that [counsel] had and we observed and looked at him throughout the trial and observed all counsel and we were—we never saw any indication of any inattention to the matter and we saw him on every motion exercising the most profound skills that we have ever seen a lawyer exercise.

There is no question in the Court's mind but that [counsel] was the most outstanding lawyer in this case. Absolutely none at all.

7. Terry originally told the police that Coe and Garris were in the bedroom for only two or three minutes.

8. "[E]very federal court that has addressed this issue [drug usage and *per se* evidence of ineffective assistance of counsel] has expressly held that alcohol or drug use, without more, is not evidence of ineffective assistance of counsel." *Bonin v. Vasquez,* 794 F.Supp. 957, 966 (C.D.Cal. 1992). *See also Young v. Zant,* 727 F.2d 1489, 1492 (11th Cir.1984).

9. Among the conclusory allegations raised in the motion, during the § 23–110 hearing, and on appeal are the following: drug usage impaired his trial counsel's preparation, performance, and his tactical decisions. Garris claimed that despite his promise to do so, his counsel did not make and use a videotape of the crime scene to undermine Officer Davis's testimony concerning his ability to see the shootings. His counsel denied having made such a promise to Garris. Garris also alleged that his counsel failed to locate and subpoena Coe; his counsel said he could not find Coe. In addition, Garris claimed that his counsel failed to hire an expert witness to discuss the type of weapon used in the murders, and that he failed to disclose to Garris his sanction for drug usage.

He performed better than the other two lawyers and including, as the [Assistant] U.S. attorney suggests, the [Assistant] U.S. attorney. He just had no equal in it. He did an outstanding job in the defense of this man.

... We had CJA lawyers representing the other defendants.

They had complete and unlimited funds to investigate this case so to speak. They investigated it from A to Z and this Court is aware that co[-]counsel in cases have opportunities to cooperate and take benefits from other investigations.

. . . .

The type of cross examination he did on [witness Terry] was in[-]depth and he got every pound of advantage that could be gotten from such a witness who came across believable and she was able to convince these jurors that these defendants committed the offense.

We just find nothing that would indicate that there was any such lack of preparation on the part of [counsel] in this case.

The trial court found no deficiency in the performance of Garris's counsel, and "no errors so serious as to deprive [Garris] of a fair trial or trial whose results ... [are] unreliable."

█ Based upon our review of the record and transcripts in this case, we agree that there is no credible evidence of deficient performance by Garris's counsel. Furthermore, we see no error that "undermines confidence in the outcome" of Garris's trial, or that rises to the level of the prejudice required for Garris to prevail on the second prong of the *Strickland* standard. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

## Payne and Garris's Other Arguments

The remaining issues raised by Payne and Garris require only brief discussion. Both Payne and Garris contend that the trial court erred in denying their motion for a new trial. In August 1993, approximately six months after appellants' trial ended in conviction, Payne filed (and Garris later joined) a motion for a new trial under Super. Ct.Crim. R. 33, based upon newly discovered evidence, a 9mm. Calico Model M–950 pistol.[10] In March 1993, Maria Thompson, a former girlfriend of Preston Coe, discovered a green and beige Polo bag left at her residence by Coe. The bag contained the Calico pistol. She got in touch with a private detective for the defense, who had previously contacted her to ascertain the whereabouts of Coe, and turned the bag and weapon over to him. A defense expert, Lester W. Roane of the H.P. White Laboratory, examined 19 cartridge cases and 22 fragments from the murder scene and the victims. He "concluded that to a reasonable degree of engineering certainty, all 19 cartridge cases ... were fired from the bolt in the [Calico]. Further, [four of the] fragments were fired from the barrel in the [Calico]."

The trial court held a hearing on the motion for a new trial on November 16, 1993. The defense viewed the Calico as "directly contrary to all of the testimony from the Government's [two] witnesses," Christine Terry and Officer Stacey Davis; and as "absolutely corroborat[ing] Mr. Garris['s] and Mr. Payne's testimony." Further, counsel for Garris asked for time to permit analysis of the Calico by "either the ATF or the FBI to get something of a definitive judgment as to whether this indeed was the gun used in the killing." The trial court decided not to hear any testimony from either Maria Thompson or the defense expert, Mr. Roane, and denied the motion, saying:

Counsel, without actually hearing your expert, the Court accepts it, that is your proffer as to what your expert would say. [Notwithstanding] that, the Court does not consider it to meet the requirement to grant a new trial. The Court considers the evidence to have been overwhelming in this case and the case did not turn on who had possession of that gun and the fact that this person, Mr. Coe, may have had

**10.** Super. Ct.Crim. R. 33 provides in pertinent part:

The Court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice.... A motion for a new trial based on newly discovered evidence may be made only before or within 2 years after final judgment....

possession at a later time or even at the time. The jury was amply given an opportunity to hear this evidence and they made a determination that your 2 defendants did the shooting there and they made no specific determination that it was with the Calico pistol or with another pistol. The jury had ample evidence and for those reasons, the Court would deny your motion for a new trial on that basis.

◼◼◼ "Absent a clear showing of abuse of discretion, decisions of the trial court regarding the denial of a new trial will not be disturbed on appeal." *Smith v. United States,* 466 A.2d 429, 432 (D.C.1983) (citing *United States v. Johnson,* 327 U.S. 106, 111–12, 66 S.Ct. 464, 466–67, 90 L.Ed. 562 (1946) (other citations omitted)). In *Heard v. United States,* 245 A.2d 125 (D.C.1968), we adopted a five-prong test for determining whether the appellant sustained his or her burden regarding a motion for a new trial based on newly discovered evidence:

> (1) the evidence must have been discovered since the trial; (2) the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) of such nature that in a new trial it would probably produce an acquittal.

245 A.2d at 126 (citing *Thompson v. United States,* 88 U.S.App. D.C. 235, 236, 188 F.2d 652, 653 (1951)). *See also Herbin v. United States,* 683 A.2d 437, 441 (D.C.1996); *Townsend v. United States,* 549 A.2d 724, 726 (D.C.1988); *Quick v. United States,* 316 A.2d 875, 876 (D.C.1974). Generally, a hearing is not required on a motion for a new trial. *Geddie v. United States,* 663 A.2d 531, 534 (D.C.1995). We review the trial court's ruling from the perspective of a " 'thirteenth juror' [to] determine whether 'a fair trial requires that the [claim presented in the motion for new trial] be made available to the jury.' " *Geddie, supra,* 663 A.2d at 533 (citations omitted).

Payne argues that the trial court did not address the five factor test, and further maintains that the discovery of the Calico pistol "would have created enough reasonable doubt that the jury would have returned verdicts of not guilty." The government maintains that the trial court properly disposed of the new trial motion, but acknowledges that the trial court did not explicitly apply the five factor test.

◼◼◼ During the hearing on the new trial motion, counsel for Payne emphasized each factor of the five-prong test for determining whether to grant a motion for a new trial based on newly discovered evidence. It is clear that the trial court assumed, for the purposes of the hearing, that the first four factors had been met, and focused on the fifth, whether the newly discovered evidence was "of such a nature that in a new trial it would probably produce an acquittal." Focusing on only the fifth factor after assuming that the first four had been met was neither error nor an abuse of discretion. Indeed, in *Townsend v. United States, supra,* the trial court assumed that the first two prongs of the *Heard* test had been met, and this court assumed that it "did likewise" with respect to the third and fourth prongs. Thus, we focused on only the fifth prong. 549 A.2d at 726.

◼◼◼ In focusing on the fifth prong here, the trial judge determined that the appellants' "case did not turn on who had possession of [the] gun...." Based on the record before us, we agree. Payne and Garris were identified by Woodfork and Carey as the men who were standing in front of the Nissan Pulsar just before they heard multiple shots. Moreover, Officer Davis saw two persons, not one person, firing a gun. None of the witnesses saw Coe with a gun on the night of the murders, and, given the other evidence in this case, the fact that the gun was later found in one of his bags alone "would [not] probably produce an acquittal." *Heard, supra,* 245 A.2d at 126. Thus, based on the record before us, we conclude that there has been no "clear showing of abuse" on the part of the trial court in denying appellants' motion for a new trial based on the newly discovered Calico gun.

◼◼◼ Payne contends that "[t]he trial court erred when it admitted the eyewitness identification by Officer Stacey Davis and

visited the [crime] scene and then affirmed its ruling on the *identification testimony.*" He maintains that the trial judge became a witness in the trial because his visit enabled him to "vouch for the testimony" of Officer Davis. The judge visited the scene alone, telling counsel they could go on their own.

> An improper view is error because of the potential problems that may result. Without presence of counsel there is no way to be certain that the premises viewed are in the same condition as when the event occurred, or that the court does not view the wrong premises or objects.

*Lillie v. United States*, 953 F.2d 1188, 1191 (10th Cir.1992) (citations omitted).[11] Clearly, the trial judge should not have visited the scene of the crime alone. However, neither Payne nor Garris preserved an objection to the trial judge's visit. Significantly, the record shows that prior to visiting the scene of the crime, the trial judge had already ruled that Officer Davis was a credible witness. Thus, he did not rely on his visit to make factual findings regarding the officer's credibility or the reliability of the eyewitness identification. Moreover, although Officer Davis's testimony contained some inconsistencies regarding the night of the murders and what he saw, he identified both Payne and Garris in court as the men he observed shooting into the Nissan Pulsar that night. Therefore, we cannot say that Payne was prejudiced by the trial judge's solo visit to the crime scene.

 Payne argues that Officer Davis's identification of him in court was suggestive because the officer had previously worked in the trial court and knew Payne's attorney who was seated next to Payne. The identification was unreliable, Payne also asserts, because of the inconsistencies in Officer Davis's descriptions of the appellants at the

time of the crimes and Officer Davis's prior statement that "more than likely [he] would not be able to see—recognize or identify either subject in the future."

In *In re W.K.*, 323 A.2d 442 (D.C.1974), we said:

> [w]here there has been no pretrial identification, courts have apparently taken it for granted that an in-court identification stands on its own if the witness had an opportunity to see the culprit at the scene of the crime even though he has not been called upon to recognize the suspect until the trial.

*Id.* at 444; *see also Brown v. United States*, 327 A.2d 539, 542 (D.C.1974). Nothing in the record on appeal supports Payne's contention of suggestivity in the identification. We see no "constitutionally cognizable impropriety in the procedure by which [Payne and Garris were] exposed to [Officer Davis]" at the time of his identification. *Middleton v. United States*, 401 A.2d 109, 134 (D.C.1979). In addition, it was the jury's task to weigh the evidence regarding the identification and to determine Officer Davis's credibility and the reliability of his identification of Payne. Consequently, we see no error in Officer Davis's eyewitness identification of Payne. *See Patterson v. United States*, 384 A.2d 663, 665 (D.C.1978).

 Accordingly, for the foregoing reasons, we affirm the judgments of the trial court.[12]

---

11. *Lillie* involved a bench trial. In the course of its opinion, the 10th Circuit stated: "Most authorities agree that it is error for a judge to take a view without providing an opportunity for counsel to attend." 953 F.2d at 1190 (citations omitted).

12. Appellants' arguments that the evidence was insufficient to convict them is without merit. Based upon the testimony of Woodfork, Carey, Terry and Officer Davis, there was ample evidence upon which reasonable jurors could find

the appellants guilty beyond a reasonable doubt. In addition, Payne's contention that the trial court erred in giving an aiding and abetting instruction is equally without merit. There was sufficient evidence to convict Payne either as a principal or as an aider and abettor, and the jury could properly return a general verdict against Payne without specifying whether he was a principal or an aider and abettor. *Greer v. United States*, 600 A.2d 1086, 1088 n. 4 (D.C.1991).