William A. WHITLEY, Appellant,

v.

UNITED STATES, Appellee.

Nos. 97–CF–1673, 00–CO–677.

District of Columbia Court of Appeals.

Submitted Oct. 11, 2001.
Decided Oct. 25, 2001.

Peter L. Goldman, Washington, DC, appointed by this court, filed a brief for appellant.

Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and John R. Fisher, Marian Borum, and Bernard J. Delia, Assistant United States Attorneys, filed a brief for appellee.

Before SCHWELB and WASHINGTON, Associate Judges, and NEBEKER, Senior Judge.

SCHWELB, Associate Judge:

On July 14, 1997, William A. Whitley was convicted by a jury of possession of cocaine with intent to distribute it (PWID), in violation of D.C.Code § 33–541(a)(1) (1998).[1] On the same day, the trial judge found Whitley guilty of unlawful possession of drug paraphernalia (PDP), in violation of D.C.Code § 33–603(a) (1998).[2] On September 9, 1999, Whitley filed a motion for a new trial on the grounds that the prosecution's narcotics expert, Detective Johnny St. Valentine Brown, Jr., of the Metropolitan Police Department (MPD), had given perjured testimony at Whitley's trial regarding his (Brown's) credentials. On April 24, 2000, in a seven-page written order, the trial judge denied Whitley's motion without a hearing.

Whitley filed timely appeals from his convictions and from the order denying his motion for a new trial. These appeals were consolidated by order of this court. Only the appeal from the order denying Whitley's post-trial motion merits plenary discussion; we affirm that order as well as Whitley's convictions.[3]

---

1. This provision has been recodified as D.C.Code § 48–904.01(a) (2001).

2. This provision has been recodified as D.C.Code § 48–1103(a) (2001).

3. Whitley's direct appeal was based on his contention that the government's proof was insufficient as a matter of law to support his

conviction of PWID, as opposed to simple possession. In light of the prosecution's evidence, summarized in Part I A, *infra*, an impartial jury could properly find, beyond a reasonable doubt, that the cocaine in Whitley's possession was intended for distribution. We conclude that Whitley's claim of evidentiary insufficiency is altogether devoid of merit. *See Earle v. United States*, 612 A.2d 1258,

## I.

## THE TRIAL COURT PROCEEDINGS

### A. *The evidence.*

█ In her order denying Whitley's motion for a new trial, the trial judge succinctly summarized the evidence at the trial. We adopt her synopsis as our own:

The evidence at trial revealed that on April 1, 1997, the defendant was in the basement bedroom of a crack house on Lamont Street, NW, cutting and packaging crack cocaine for distribution when police entered. The police observed two men engaged in a drug sale in the hallway before they went to the back bedroom. Initially oblivious to the police presence, Defendant was using a razor blade to cut pieces of crack cocaine from a large white rock of crack that was on a plate in front of him. He had numerous ziplock bags on the plate and bed. Some bags were already filled with pieces of crack; some were empty. When Detective Milton Norris, who had observed all this, identified himself to Defendant as a police officer, Defendant threw his hands up over his head and acknowledged that he had been caught red handed. Detective Norris seized the drugs and the razor and found $113 on Defendant's person.

The Drug Enforcement Administration Laboratory (DEA) found that the large rock was 9.4 grams of cocaine base of which 92 percent was pure cocaine. The DEA found in the small ziplock bags an additional 1.3 grams of cocaine base of which 84 percent was pure cocaine and found cocaine residue on the razor blade.

Detective Johnn[y] St. Valentine Brown qualified to testify as an expert after discussing his 27 years of law enforcement experience. He stated that his knowledge of the drug field was "further enhanced by the fact that I am a board certified pharmacist. I received, maintained, compound[ed] and dispensed narcotics substances per prescription." He was not asked and did not volunteer any information about his formal education or degrees. He opined that the small ziplock bags with small amounts of crack were ready for distribution. He opined that the large rock could be cut and packaged into 62 $20 rocks for a total street value of $1,240 but would not be sold on the street in bulk form. He opined that the difference in strength between the cocaine already bagged and that of the rock could mean either different batches or crude mixing resulting in one end of the rock being different than the other.

James McNeil testified for the defense. He was arrested on April 1, 1997, in the basement of 1032 Lamont Street after the police saw him throw down a ziplock bag of cocaine exactly like the bags on Defendant's plate. He pled guilty to possession with intent to distribute cocaine. He testified that he had bought his cocaine elsewhere and that he and Defendant had entered the basement to use the bathroom after drinking beer. He denied seeing drugs or drug paraphernalia in the bedroom.

(Citations to transcript omitted.)

### B. *Detective Brown's false testimony.*

Detective Johnny St. Valentine Brown, Jr., also known by his nickname of "Jehru," has long been a familiar figure to judges, attorneys and jurors involved in

1270 (D.C.1992); *United States v. Glenn,* 314 U.S.App. D.C. 202, 207–08, 64 F.3d at 706, 711–12 (1995); *United States v. Williams,* 344 U.S.App. D.C. 64, 67, 233 F.3d 592, 595 (2000) (*Williams II*).

the trials of drug prosecutions in the District of Columbia. *See, e.g.,* Edward D. Sargent, *Flamboyant Narcotics Expert is Key Witness in Drug Cases,* WASHINGTON POST, May 6, 1983, at C1. At the trial of the present case, Brown claimed that he had "testified on over 4000 occasions in [an] expert capacity in some 26 jurisdictions throughout the country." Judge Stanley Sporkin wrote of Brown in *United States v. Jones,* 84 F.Supp.2d 124, 126 (D.D.C. 1999), as follows:

> A police officer for over twenty years, Brown has testified in numerous cases as a narcotics expert. While most of his testimony has been on behalf of the government, on a few occasions he has even testified for the defense. Detective Brown has been a witness before this Court on numerous occasions. He is charismatic and his testimony has generally been well received by juries.

At various times, Brown has claimed to possess a Ph.D and other degrees in pharmacology, *see, e.g., id.* at 124, and to be a "Board certified pharmacist." *See, e.g., United States v. Williams,* 77 F.Supp.2d 109, 111 (D.D.C.1999) (*Williams I*), *aff'd, Williams II, supra* note 3. In the present case, as noted by the trial judge, *supra* page 631, Brown testified under oath that he was a Board-certified pharmacist and that he had dispensed narcotics per prescription.

In July 1999, two years after Whitley's convictions in this case, Detective Brown suddenly resigned from the MPD after his truthfulness had been called into question. *See* Bill Miller, *Accused of Perjury, Police Expert Resigns,* WASHINGTON POST, July 23, 1999, at B1. According to Miller's article, Detective Brown had testified in a deposition in a civil suit that he had received a Ph.D degree in pharmacology from Howard University, as well as a bachelor's degree and a master's degree in the same

discipline. The article further reported that the University had searched its records but had been unable to verify Brown's claim, and that Brown had resigned from the police force. The report in the *Washington Post* precipitated a number of collateral attacks on convictions in cases in which Detective Brown had testified as an expert for the prosecution. *See, e.g., Jones, supra,* 84 F.Supp.2d at 125. Whitley's case is the first such collateral attack to reach this court.

Seven weeks after the publication of Miller's article, Whitley filed a motion for a new trial, pursuant to Super. Ct.Crim. R. 33 and D.C.Code § 23–110 (2001), on the basis of newly-discovered evidence. Whitley presented the article to the court as an attachment to his motion. Whitley relied on evidence, not previously available, that Detective Brown had lied at trial about his credentials, and he claimed that Brown's false testimony "played a fundamental role in persuading the jury of Mr. Whitley's guilt of PWID as opposed to mere possession."

In its response to Whitley's motion, the government stated that it was still investigating the claim that Detective Brown had falsely represented his academic credentials. The government argued, however, that even assuming Detective Brown's testimony that he was a board-certified pharmacist to be false, the defendant still was not entitled to a new trial, *inter alia,* because, according to the government, Detective Brown's "formal credentials are a *de minimis* part of his overall expertise, and ... being a pharmacist is irrelevant to knowing how cocaine is distributed on the streets of the District." (Internal quotation marks omitted.)

On February 10, 2000, while Whitley's motion for a new trial was pending, Detective Brown entered a plea of guilty to eight counts of perjury. As the trial judge dis-

closed in her written order, Brown "admitted that he did not have a pharmacology degree or a license to practice pharmacy.... In many cases, although not in this one, [he] has lied about earning a degree from Howard University."

C. *The trial court's decision.*

The trial judge denied Whitley's motion. She wrote, in pertinent part, as follows:

> First, Detective Brown's false claim to being a pharmacist in this case was an irrelevant part of his credentials as an expert. His extensive street experience as an undercover narcotics officer and as a narcotics detective qualified him and made him persuasive as a drug expert in a case involving cocaine. This case did not involve any opinions about prescription drugs handled by pharmacists. Thus, even if he had not lied about being a pharmacist or [if] the falsity of that credential had been exposed, it is likely that the jury would still have credited his testimony based on his many years of practical experience.

> Second, the evidence against the defendant in this case was so overwhelming that there is no reason to believe that the jurors might have reached a different conclusion even if they had discounted or not received Detective Brown's testimony. The defendant was caught red-handed cutting up a large rock of crack cocaine with small ziplock bags all around. Defendant ignores that evidence when he states that he merely had possession of a small quantity of drugs of a different purity level [from] those being manufactured in the area. Detective Norris saw the defendant in possession of both the small ziplock bags and the large rock. Moreover, he saw him using a razor blade to cut up the large rock. Defendant had money and McNeil, a drug user, was near him with

an individual ziplock bag of cocaine. The police had observed a drug sale in the hallway. With this eyewitness testimony, the jury did not need an expert's opinion to conclude from that evidence that Defendant, with empty and full ziplocks at hand, intended to distribute the cocaine that he was in the process of cutting. [(Footnote omitted.)]

> ....

> Jurors could rely on common sense and everyday experiences in distinguishing mere personal use from distribution. For example, at a bakery, a customer who merely wants a taste of cake would take a slice already cut for sale. It is the shopkeeper with the intent to sell pieces of cake, who cuts slices from the whole cake and wraps them individually. Any one slice of cake could have more cherries than another if the batter was crudely mixed.... Most importantly, the facts of the case itself established Defendant's intent to distribute. No expert opinion was required. [(Citation omitted.)]

> In conclusion, the evidence of Defendant's intent to distribute was compelling and not tainted by Detective Brown's lies.

## II.

## LEGAL ANALYSIS

A. *The standard of review.*

 "Absent a clear showing of abuse of discretion, decisions of the trial court regarding the denial of a new trial will not be disturbed on appeal." *Payne v. United States,* 697 A.2d 1229, 1234 (D.C.1997). The judge who presided over the trial and had the opportunity to develop a "feel" for the case, *see, e.g., In re S.G.,* 581 A.2d 771, 774–75 (D.C.1990), is in a superior position to that of an appellate court to discern whether newly discovered evidence has

any appreciable potential for affecting the jury's verdict. We therefore accord substantial deference to the trial court's disposition, especially where, as here, the judge obviously gave the issue considerable thought and issued a carefully analyzed written decision.

## B. *Newly discovered evidence.*

■ In *Thompson v. United States,* 88 U.S.App. D.C. 235, 236, 188 F.2d 652, 653 (1951), the court adopted a five-prong standard for determining whether a defendant is entitled to a new trial on the basis of newly discovered evidence:

> (1) [T]he evidence must have been discovered since the trial; (2) the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) of such nature that in a new trial it would probably produce an acquittal.[4]

In conformity with *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971), this court has applied verbatim the standard set forth in *Thompson. See, e.g., Heard v. United States,* 245 A.2d 125, 126 (D.C.1968) (quoting *Thompson*); *Payne, supra,* 697 A.2d at 1234 (quoting *Heard*).

In *Williams II, supra* note 3, a case in which, as in this one, the defendant unsuccessfully sought reversal of his PWID conviction upon the ground that Detective Brown had testified falsely regarding his credentials, the United States Court of Appeals adhered to the standard that it had articulated in *Thompson* and required the defendant to show that a new trial would *"probably* produce an acquittal." 344 U.S.App.D.C. at 65, 233 F.3d at 593 (emphasis in original). The court noted the decision in *Larrison v. United States,* 24 F.2d 82 (7th Cir.1928), in which it was held that where, without the prosecutor's knowledge, perjury had occurred at trial, the appropriate inquiry on a motion for a new trial was whether, without the perjured testimony, the jury *"might have* reached a different conclusion." *Id.* at 87 (emphasis added). The court disagreed with *Larrison's* reasoning, however, and "join[ed] several other circuits in rejecting *Larrison." Williams II,* 344 U.S.App.D.C. at 66, 233 F.3d at 594 (citations omitted). The court opined that "the [*Larrison*] test, if literally applied, should require reversal in cases of perjury with respect to even minor matters." *Id.* (quoting *United States v. Stofsky,* 527 F.2d 237, 245–46 (2d Cir.1975)).[5] That, in the court's view, was "reason enough to reject *Larrison." Id.* The court went on to explain in *Williams II* that

> [t]he difference between *Larrison* and *Thompson* is not just in the use of "might" versus "probably." *Thompson* looks ahead and evaluates the outcome of a new trial; *Larrison* looks back and evaluates the impact of the perjury on the jury in the original trial.

344 U.S.App.D.C. at 66, 233 F.3d at 594.[6] We agree with the court in *Williams II*

---

4. In this case, the parties have focused on whether the fifth *Thompson* prong applies to these facts and, if so, whether this prong has been satisfied.

5. This interpretation of *Larrison* by the court in *Williams* is not the only possible reading of that decision. The italicized words "might have" could fairly be construed as meaning "might reasonably have."

6. In some circumstances, different from those here presented, the "look forward" approach is not applicable. Where, *e.g.,* the prosecution has failed to provide the defense with exculpatory evidence in the government's possession, in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the court looks back to determine whether "there is a reasonable probability

that motions such as Whitley's should be decided on the basis of the probable outcome of a new trial, and, like that court, we apply the *Thompson–Heard* standard to the record before us.

### C. The judge's exercise of discretion.

■ Applying the foregoing principles, we conclude that the trial judge did not abuse her broad discretion in denying Whitley's motion for a new trial. As the judge demonstrated in her order denying the motion, see pages 6–7, *supra*, the evidence against Whitley was overwhelming, both as to his undisputed possession of the cocaine and as to his intent to distribute the unlawful drug. Indeed, Whitley admitted to the police at the scene that he was "caught red-handed." Whitley's attorney argues on appeal that, when Whitley used this phrase in talking to Detective Norris, he meant only that he had been caught in possession of the cocaine. According to counsel, Whitley did not intend to admit that the cocaine was intended for distribution. In fact, however, Whitley was apprehended cutting slices from a rock of crack so that the contraband could be placed in nearby ziplock containers for distribution. The meaning of what was going on was evidently obvious both to the defendant and to the officers: Cocaine was being prepared for sale. At the very least, an impartial jury could reasonably so find; indeed, it is difficult to imagine how rational triers of fact could have reached any other conclusion. Moreover, as the trial judge noted, the subject matter regarding which Detective Brown lied—whether he

was a licensed pharmacist—was irrelevant to the issues before the jury.[7]

Under the *Thompson* standard as applied by our federal appellate colleagues in *Williams II*, we look forward rather than backward in determining whether Whitley is entitled to a new trial. In other words, we ask whether there is a reasonable probability that the outcome of a new trial would be different from the result in the first trial. The answer to that question must surely be "No!" To adapt the language of *Williams II*, 344 U.S.App.D.C. at 67, 233 F.3d at 595, to the record before us, "[i]f [Whitley] were retried, the government would have at its disposal any number of experts who could testify that the amount of [cocaine] in his possession [and the circumstances in which Whitley possessed the cocaine] w[ere] inconsistent with personal use." It is therefore probable that a new trial for Whitley would largely be a replay of the first, except that the prosecution expert presumably would not perjure himself or herself, even on a largely irrelevant aspect of the witness' credentials. Here, as in *Williams II*, "it is most unlikely that a jury would acquit [Whitley of PWID] in a new trial." *Id.* Accord, *Doepel v. United States*, 434 A.2d 449, 460–61 (D.C.), *cert. denied*, 454 U.S. 1037, 102 S.Ct. 580, 70 L.Ed.2d 483 (1981) (affirming a ruling by the trial judge that the defendant was not entitled to a new trial, notwithstanding the discovery after trial that an FBI serologist had lied about his academic credentials and had engaged in other deceptive conduct; the court held

---

that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). In the present case, the prosecution had no information at the time of trial that part of Detective Brown's testimony was

false, and *Brady* principles have no application.

7. We note, on the other hand, that if Detective Brown was prepared to commit perjury on this subject, an impartial trier of fact might reasonably be less inclined to believe other parts of his testimony.

that the verdict could properly be sustained on the basis of the independent evidence corroborating the expert's substantive testimony); *Williams I, supra,* 77 F.Supp.2d at 114 (summarizing and applying the holding of *Doepel*); *cf. Oxendine v. Merrell Dow Pharms., Inc.,* 563 A.2d 330, 335–38 (D.C.1989), *cert. denied,* 493 U.S. 1074, 110 S.Ct. 1121, 107 L.Ed.2d 1028 (1990) (reversing, as an abuse of discretion, a trial court order that had granted a defendant in a civil case a new trial because an expert witness for the plaintiff had misrepresented his academic credentials).

## III.

## CONCLUSION

For the foregoing reasons, Whitley's convictions and the order denying Whitley's motion for a new trial are

*Affirmed.*