Vincent BENTON, Appellant,

v.

UNITED STATES, Appellee.

Nos. 99–CF–524, 01–CO–1279.

District of Columbia Court of Appeals.

Argued Dec. 10, 2002.
Decided Jan. 23, 2003.

Donna L. Biderman, for appellant.

David B. Goodhand, Assistant United States Attorney, with whom Roscoe C. Howard, United States Attorney, and John R. Fisher, Elizabeth Trosman, and Patricia A. Hefferman, Assistant United States Attorneys, were on the brief, for appellee.

Timothy P. O'Toole, with whom James Klein, Samia Fam, Washington, DC, and Corrine Beckwith, were on the brief, for amicus curiae the Public Defender Service.

Before FARRELL, REID, and WASHINGTON, Associate Judges.

FARRELL, Associate Judge:

 Benton appeals from his conviction for distributing cocaine on the ground that the government failed to disclose at trial that a police witness, Detective Johnny St. Valentine Brown, who testified as an expert on the chain of custody of recovered drugs, had falsified his credentials as an expert in other criminal trials. We rejected a claim of prejudice resulting from Brown's perjury as to his qualifications in *Whitley v. United States,* 783 A.2d 629 (D.C.2001), *modified on rehearing,* 796 A.2d 26 (D.C.2002), applying the standards for a new trial based on newly discovered evidence. *See* Super. Ct. Crim. R. 33.[1] Benton argues that this case differs because the nondisclosure of Brown's perjury is claimed here (unlike in *Whitley*) to have been a breach of the government's constitutional duty of disclosure under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its correspondingly lesser requirement for showing prejudice. Under the *Brady* doctrine, suppression of favorable evidence by the prosecution requires reversal of a conviction if "there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene,* 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Otherwise stated, favorable evidence that is suppressed is "material" under *Brady*—and requires reversal—if it "could reasonably be taken to put the whole case in such a different light

---

1. As we recounted in *Whitley,* following years of testimony by Brown as a police expert on narcotics practices, it was discovered in 1999 that he had regularly lied under oath about his academic credentials, falsely claiming that he had a degree in pharmacology and was a board-certified pharmacist. Ultimately Brown pled guilty in federal court to multiple counts of perjury in this regard. *See Whitley,* 783 A.2d at 632–33.

as to undermine confidence in the verdict." *Kyles v. Whitley,* 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). It is the defendant's "burden ... to establish a reasonable probability of a different result." *Strickler,* 527 U.S. at 291, 119 S.Ct. 1936 (emphasis deleted).

■ The parties agree that Brown's falsification of his credentials on other occasions (no claim is made that he lied about his qualifications in this case) was potential impeaching evidence and thus favorable to the defense. Assuming further, as we do, that his prior acts of perjury were evidence "suppressed by the State," *Strickler,* 527 U.S. at 282, 119 S.Ct. 1936,[2] we nevertheless find no reasonable probability that revelation of that conduct at trial would have changed the jury's verdict in this case.[3] Brown was not a witness to the crime, nor did his expert testimony purport to illuminate the acts making up the distribution. Benton's sale of cocaine to a police agent was captured on a videotape and voice recording by equipment mounted in the unmarked police car where the sale took place. Other members of the police team watched portions of the transaction, and Benton was detained by the police an hour later wearing the same distinctive T-shirt he had been seen wearing on the videotape. During the recorded transaction he twice touted the quality of the drugs he was selling the police agent.

Brown's expert testimony related to none of these facts except to the nature of the substance Benton sold, and then only in a limited way: he testified to the procedures by which the police generally maintain custody of drugs from initial recovery until analysis by a Drug Enforcement Administration (DEA) chemist. Even so his testimony had limited importance. Officer Xanten, who witnessed the sale, had previously described how he field-tested the purchased drugs (yielding a positive result for cocaine); then placed them in a plastic heatseal envelope along with the DEA-7 form identifying the substance, the purchase price, the date purchased, and the case and buy number; and deposited the heatseal envelope in the police-district narcotics lock box, which was guarded around the clock and could be opened only by narcotics branch officers. Brown's ensuing testimony covered the remaining few steps in the chain of custody—the retrieval of the drugs by a "major narcotics branch" carrier who checked them for evidence of

**2.** The government disputes this proposition, arguing that "personal information about a police officer [here Brown's false academic credentials], known only to that officer, and unrelated to the investigation of the case or the issues at trial, should [not] be imputed to the government" for *Brady* purposes (Brief for Appellee at 35). Although we need not resolve the point to decide this case, the government's thesis is problematical beginning with its limitations—*e.g.,* its premise that the detective's (Brown's) perjury must be "unrelated to the ... issues at trial." Since Brown testified as a government witness, his credibility was an "issue[ ] at trial," and past instances of his lying under oath would have been relevant thereto. The government's assertion that Brown was an ancillary witness who took no part in investigating the crime seems to us properly an argument that his testimony was not material in the *Brady* (outcome-determinative) sense, rather than a claim that his prior perjury fell outside the prosecutor's "duty to learn of [and disclose] any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles,* 514 U.S. at 437, 115 S.Ct. 1555.

**3.** We reach that conclusion regardless of whether the proper standard of appellate review under *Brady* gives deference to the trial court's decision (*i.e.,* asking whether its decision on materiality "was reasonable,") *McCoy v. United States,* 760 A.2d 164, 184 (D.C. 2000), or requires *de novo* review. *See Farley v. United States,* 767 A.2d 225, 228–29 (D.C. 2001) (leaving open issue of standard of review of *Brady* rulings).

tampering, and the eventual conveyance of the drugs to the DEA for analysis. Brown confirmed Xanten's testimony that the "lab number" which the DEA chemist placed on his report matched the same number the police had earlier placed on the DEA-7 form. And the chemist's report itself, confirming that the drugs had been received in a sealed container from the police and resealed after testing, was introduced into evidence during Xanten's testimony.

■ "[W]hen [an] item has been in the possession of government officials charged with its keeping, the court may assume, absent evidence of tampering, that the officials properly discharged their duties." *Ford v. United States*, 396 A.2d 191, 194 (D.C.1978). No suggestion of tampering was made in this case, and so nothing rebutted the presumption that the object Benton sold was the substance eventually identified by the DEA as cocaine. *Id.* at 195. Although Brown's testimony implied that the police here had followed their regular procedures for safeguarding narcotics evidence, there is no reason to suppose that had the jury learned of his past perjury and thus been troubled by *his* reliability as a witness, they would have drawn the further inference that the police in general allowed the corruption of the evidence in this case. Indeed, as the government points out, had the prosecutors trying the case actually learned of Brown's prior perjury, it is unlikely they would have even offered Brown as their expert rather than another officer equally qualified to testify about the standard matter of chain of custody. *See United States v.*

*Gale,* No. 01–3011, 2003 U.S.App. Lexis 137, at * 10–11 (D.C.Cir. January 7, 2003) (stating that "[Gale] has offered no reason to believe that, had the impeachment evidence [concerning Brown's past perjury] ... 'been disclosed to the defense,' the government would have foolishly charged ahead, blindly offering Brown ... rather than ... another expert"; and contrasting this with *Kyles* and *Strickler,* "in both of which the impeached witness was a fact witness who could not be readily replaced."). At the least, the supposition that the jury would have rejected the government's entire case based on doubts about Brown's reliability does not rise to the level of a "reasonable probability" of a different verdict under *Brady, see Strickler,* 527 U.S. at 291, 119 S.Ct. 1936 (emphasizing critical difference between reasonable "probability" and "possibility" of a different outcome); it does not "put *the whole case in such a different light* as to undermine confidence in the verdict." *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555 (emphasis added); *see also Whitley,* 783 A.2d at 635 ("the subject matter regarding which Detective Brown [had] lied—whether he was a licensed pharmacist—was irrelevant to the issues before the jury").[4]

*Affirmed.*

---

**4.** Appellant argues that the trial judge herself implicitly recognized the importance of Brown's testimony when she threatened to dismiss the prosecution after the expert (not Brown) originally scheduled to testify on chain of custody had not appeared. However, Brown did appear and testify, and so the issue is not what the judge might have done (rightly or wrongly) had no expert supplemented Officer Xanten's testimony on chain of custody; rather it is what effect—as a matter of reasonable probability—the undisclosed impeachment evidence could have had on the jury's verdict, to which our answer is "none."