Ernest W. JOYNER, Appellant,

v.

UNITED STATES, Appellee.

Nos. 97–CF–771, 97–CO–1621, 99–CO–1661.

District of Columbia Court of Appeals.

Argued Jan. 25, 2002.
Decided Aug. 8, 2002.

---

Jonathan E. Rubens, Reston, VA, appointed by the court, for appellant.

Roy W. McLeese III, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and John R. Fisher, Robert Little, Vincent Caputy, Jr., and Thomas S. Rees, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, FARRELL and RUIZ, Associate Judges.

RUIZ, Associate Judge.

Following a jury trial, Ernest Joyner was convicted of assault with a dangerous weapon,[1] carrying a pistol without a license,[2] and one count of possession of a firearm during a crime of violence ("PFCV").[3] Although a mistrial was declared after the jury could not reach agreement on two additional counts—first degree murder while armed[4] and a related PFCV count—a second jury convicted appellant of both of these charges in a subsequent trial. On appeal from the second trial, Joyner argues that the trial court improperly allowed the government to impeach a defense witness for bias with insufficient evidence, and further erred in denying his motion alleging ineffective assistance of counsel, filed pursuant to D.C.Code § 23–110 (2001), without a hearing on the issue of trial counsel's drug use and psychiatric treatment. We agree that the trial court erred in allowing bias questioning of a defense witness without a proper basis for such questions, but we conclude that this error was harmless in light of the overwhelming evidence of appellant's guilt. Additionally, we hold that the trial court did not abuse its discretion in denying his § 23–110 motion without a hearing because appellant has failed to allege prejudice as required by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and there is no indication that defense counsel was impaired during trial by any alleged drug use or psychiatric problems.[5]

---

**1.** *See* D.C.Code § 22–502 (1996) (recodified as D.C.Code § 22–402 (2001)).

**2.** *See* D.C.Code § 22–3204(a) (1996) (recodified as D.C.Code § 22–4504(a) (2001)).

**3.** *See* D.C.Code § 22–3204(b) (1996) (recodified as D.C.Code § 22–4504(b) (2001)).

**4.** *See* D.C.Code §§ 22–2401 and –3202 (1996) (recodified as D.C.Code §§ 22–2101 and –4502 (2001)).

**5.** Although this case was originally submitted without a request for oral argument, we *sua sponte* scheduled the case for argument and additionally ordered counsel to be prepared to address defense counsel's potential conflict of interest in light of her indictment and

## I.

### A. The Government's Case

On the evening of October 16, 1992, at approximately 11:30 p.m., Tonya Johnson was shot five times and killed by a masked gunman in the vicinity of Yum's Carryout in the 1300 block of Wallach Place, N.W. Mario Manigan, a friend of appellant's, was wounded during the shooting by a stray bullet which lodged in his hip, and he was present at the scene of the crime when the police arrived. Several eyewitnesses observed the murder and identified the gunman as a black man with a light complexion, wearing a black mask which covered the lower half of his face. They also stated that he wore a long-sleeved black shirt and blue jeans, and carried a black revolver. All of the eyewitnesses saw the gunman run into an alley off of Wallach Place immediately after the shooting.

Two witnesses related their observations of Manigan's actions leading up to the shooting. Ronda Albert indicated that Manigan had been near a phone booth just prior to the shooting, looking down Wallach Place, and ran across the street toward Yum's Carryout moments before the shots were fired. Eyewitness Cyril Gibbs further testified that Manigan was walking back and forth, looking up the street and waiting to use the phone which Johnson was using just before she was shot and killed. When Johnson got off the phone and went into Yum's, Manigan used the phone until Johnson returned, at which

point he waited a few moments before making a "mad dash across the street."

Nearby and just prior to the shooting, Officer Warren Alexander of the Metropolitan Police Department was sitting with Reserve Officer David Best in Best's car in the 1300 block of U Street, N.W., facing south with a view of Wallach Place.[6] At approximately 11:30 p.m., the officers heard five gunshots in succession from what they believed sounded like a large caliber weapon. Both exited the car, at which point they noticed a light-skinned black man slowing from a run to a brisk walk emerging from an alleyway that leads toward Wallach Place, stuffing a dark object down the front waistband of his pants. This man, later identified as appellant, repeatedly looked over his shoulder back down the alleyway toward Wallach Place. Officer Alexander announced himself as a police officer and ordered appellant to stop, whereupon appellant broke into a run eastbound on the south side of U Street. As Officers Alexander and Best began to chase appellant on foot on opposite sides of the street, appellant removed a gun from his waistband and turned to fire at Officer Best. Officer Alexander fired a single shot at appellant but missed.

As the chase continued, Officer Alexander used his radio to request assistance in apprehending appellant. A police car in the area responded, moving westbound on U Street towards 13th Street, forcing appellant to turn south onto 13th Street. Appellant crossed a grassy area as he changed direction, stumbled, and placed a

---

guilty plea to Criminal Justice Act voucher fraud in 1999. Appellant's counsel conceded at oral argument that, at the time of the second trial, there was no conflict of interest with regard to defense counsel's representation of appellant because counsel was not aware that she was being investigated by the U.S. Attorney's Office for voucher fraud until she was subpoenaed in July of 1997, several

months after appellant's second trial in February of 1997.

6. Officer Best testified at the first trial but died before the second trial. The transcript of his testimony from the first trial was read to the jury by the prosecutor at the subsequent trial.

gun and a mask on the ground before continuing to flee. Officer Best recovered the mask and gun, and the additional responding officers were able to catch appellant, handcuff him, and place him under arrest.[7] Five spent shell casings were found in the recovered weapon.

Shortly after appellant had been apprehended, a hysterical young woman approached Officer Alexander and informed him that someone had been shot. In response to his questioning, she indicated that she had seen the shooter, describing him as a "light-skinned" black man, and had seen him run through the alleyway off of Wallach Place. Officer Alexander did not obtain this woman's name or contact information.

*B. The Defense's Case*

Four witnesses testified for the defense. In response to testimony by government witnesses that the gunman fired the fatal shots with the weapon in his right hand, appellant's mother testified that appellant is left-handed. Timothy Butler testified that on the evening of the shooting he had gone to a movie at the Embassy Theater on Florida Avenue at 10:00 p.m. with Manigan, which ended a little after 11:00 p.m. He was walking home and was near the intersection of 14th Street and Wallach Place around 11:30 p.m. when he saw appellant at a phone booth talking on the phone. He then saw a "young guy" who was not appellant come from the south of 14th Street and begin shooting, but he did not see appellant after the shooting. Butler was impeached with two prior drug convictions, and admitted he was a friend of appellant. The government also called the general manager for the Cineplex

Odeon theaters, which operated the Embassy Theater, as a rebuttal witness. He testified that the Embassy Theater was a single screen movie theater and that the showtimes on the night of October 16, 1992 were 7:15 p.m., 9:30 p.m., and midnight, with the 9:30 show ending at approximately 11:40 p.m.

A third defense witness, Tonnette Walker, stated that she was in the area of 14th Street and Wallach Place on the night of the shooting and saw the shooter, who she claimed was not appellant. She testified that she was the unidentified woman who had approached the police and tried to tell them what she knew, but that they informed her that they had "everything under control" and did not request her name or address. On cross-examination, Walker admitted that she did not know who the shooter was and that she did not see the shooting.

*C. Testimony of Mario Manigan*

Manigan, the fourth defense witness, testified that he and Butler were in the vicinity of 14th Street and Wallach Place on the night of the shooting looking for his cousin when he noticed appellant on the phone at a phone booth and waved to him. As Manigan waved, an individual came from Wallach Place and began shooting at Johnson. Manigan claimed the shooter was not appellant and stated that he turned to run but was shot.

On cross-examination, Manigan was impeached with a prior conviction for assault with a dangerous weapon, a handgun. The prosecutor then asked the following questions:

---

**7.** While Officer Alexander did not make an in-court identification of appellant, he testified that he never lost sight of the suspect he had been chasing, and that he saw another officer arrest him. That officer was able to positively identify appellant in court as the suspect apprehended on the night of Johnson's murder.

Q: Now you indicated that as you were coming up the street that you waved to the defendant. Isn't it a fact that where you were standing is right next to that phone booth?

A: No.

Q: Isn't it a fact that you stood there next to that phone booth while the decedent was on the phone, and when she went into Yum's for the last time you got on that phone and used it?

A: No.

Q: Isn't it a fact that after you got off the phone and she came back you continued to stay there looking up the street, looking up ... Wallach Place, for this man, because you were expecting him; isn't that true?

A: No.

Q: Well, isn't it a fact that just as he came running down the street to shoot the victim that you high tailed across the street to the other side cause you knew that was going to happen?

A: No, I was—I was—

Q: You were what?

A: As I spoke to him, like I said, as I spoke to him that's when the person came from around the corner shooting. How could I do all of that, run across the street and I'm shot?

After questioning Manigan about a photograph taken of his injury at the crime scene, the prosecutor turned to the subject of his knowledge of Tonya Johnson, the murder victim, and asked him if he knew Lennie Harris. Defense counsel objected to the question and a bench conference ensued, at which the trial court asked the prosecutor the relevance of Manigan's knowledge of Harris. The prosecutor replied that "Lennie Harris was this person's very good friend, and Lennie Harris was killed in front of Tonya Johnson's place. Establishes his bias against the victim as well as a potential bias for the defendant who killed her." The trial court then excused the jury for more discussion of the issue.

Providing further explanation, the prosecutor proffered that Manigan had testified in front of the grand jury that Harris, his "lifelong friend," was shot "right in front of the decedent's home," and that he intended to introduce this evidence through cross-examination of Manigan to show bias. Characterizing the evidence as "highly prejudicial and highly speculative" as no one had ever been charged with the shooting of Harris, defense counsel objected, suggesting that the mere fact that Harris was killed in front of Johnson's residence did not show any knowledge of how, or by whom, Harris was killed. Although the trial court was not persuaded by defense counsel's objections based on the inadmissibility of other crimes evidence, the trial court probed the government's bias theory, asking further details concerning the location of Harris' death. The prosecutor proffered that Harris and Johnson had been lovers, that Harris had gone to visit Johnson at her house, and that Harris was killed "[l]iterally right on the steps on the house" as someone drove by and shot him. As a result of this proffer, the trial court agreed with the prosecutor that the "very fact that [Harris] was at [Johnson's] house coinciding with his being shot could cause someone rationally or irrationally" to conclude Johnson might somehow be involved, and it overruled defense counsel's objections as the questioning was not to implicate the defendant in the murder of Harris, but "just to show bias of this witness." Cross-examination then continued as follows:

Q: You know Lennie Harris, don't you?

A: I know him.

. . .

Q: In fact you've known Lennie Harris since you were in elementary school, haven't you?

A: Yeah.

Q: You also knew that Lennie Harris got shot that very summer, didn't you?

A: What very summer?

Q: I'm sorry?

A: I say what very summer?

Q: The summer just before Tonya Johnson got gunned down.

A: I can't remember.

Q: The summer of 1992, July.

A: I don't remember, I cannot remember.

Q: You know he got shot, don't you?

A: Yeah.

Q: In fact, you know he got shot right on the very steps in front of Tonya Johnson's house, don't you?

A: No, I don't know.

Q: You don't know that?

A: No.

. . .

Q: But you hadn't heard that your— one of your lifelong friends got shot and was shot, just happened by coincidence to be right on the very sidewalk in front of Tonya Johnson's house.

. . .

Q: It's your testimony that you had not heard that your lifelong friend Lennie Harris had been shot right on the very steps in front of Tonya Johnson's house?

A: I think I said I ain't know.

## II.

 We consider first appellant's claim that the trial court abused its discretion in allowing the government to question Manigan with regard to his knowledge of the circumstances surrounding the death of Lennie Harris. "An exercise of judicial discretion 'will not be reversed unless it appears that it was exercised on grounds, or for reasons, clearly untenable or to an extent clearly unreasonable.'" *Clayborne v. United States,* 751 A.2d 956, 963 (D.C.2000) (quoting *(James) Johnson v. United States,* 398 A.2d 354, 363 (D.C. 1979)). "Bias or testimonial motivation is always a proper subject of cross-examination." *Id.* at 962. We have required, however, that the examiner must have a reasonable factual foundation or at least a "well-reasoned suspicion" that the circumstances indicating bias might be true. *See id.* at 962–63; *accord, Ray v. United States,* 620 A.2d 860, 862–63 (D.C.1993). This "good faith basis" requirement for bias cross-examination is both flexible and lenient, *Clayborne,* 751 A.2d at 963, but a proper foundation must include a proffer of some facts supporting a genuine belief that the witness is biased in the manner asserted, and sufficient facts to permit the trial judge to evaluate whether the proposed question is probative of bias. *See Guzman v. United States,* 769 A.2d 785, 790 (D.C.2001).

 Appellant claims that the government's proffer concerning defense witness Mario Manigan's bias against the person appellant was charged with shooting failed to meet the minimum foundation required before cross-examination for bias is permissible.[8] He further contends that the

---

8. We disagree with the government's assertion that we should review appellant's foundational challenge to the bias cross-examination for plain error because defense counsel failed to specifically object to such a lack of foundation, citing *United States v. Olano,* 507 U.S. 725, 732–33, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Defense counsel challenged the gov-

government's questions suggesting a conspiracy between appellant and Manigan to kill Johnson was highly prejudicial because it "smuggled into evidence other crimes evidence suggestive of motive" without meeting the requirements for the admissibility of other crimes evidence.

We reject as insufficient the government's proffer of Manigan's bias, which consisted only of the facts that Harris and Johnson had been lovers and that Harris was killed on the front steps of Johnson's house. No further information was proffered to connect Johnson to the death of Harris. These scant facts do not even remotely suggest that Johnson was somehow involved in Harris' shooting. To the contrary, a more reasonable inference would be that Harris was shot at a place he was likely to frequent—his lover's home—and that she would not have been complicit in his death. To be sufficient, a proffer must be probative that the witness is biased in the manner asserted. This requires that the bias be reasonably inferable from the facts. If the fact-finder can only draw the inference "irrationally," as the trial court suggested might be the case here, the proffer is insufficient. Thus, we conclude that the trial court erred in allowing the government to pursue this line of questioning as the factual foundation was far from sufficient to sustain a reasonable inference of bias.

█ We therefore turn to the question of whether the trial court ruling, though erroneous, was nonetheless harmless. *See Mercer v. United States,* 724 A.2d 1176, 1194 (D.C.1999) (holding that with respect to a non-constitutional issue, we will reverse "if the court cannot say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment

was not substantially swayed by the error' ") (quoting *Harris v. United States,* 602 A.2d 154, 159 (D.C.1992) (en banc)); *Wright v. United States,* 513 A.2d 804, 811 (D.C.1986); *cf. (James) Johnson,* 398 A.2d at 367 (review of exercise of discretion includes "whether the impact of [ ] error requires reversal"). We begin with the recognition that the government's cross-examination unnecessarily brought a second, unrelated murder into a trial where the jury was considering a murder charge. That potentially serious defect was mitigated by the fact that the prosecutor's cross-examination on Manigan's knowledge of the facts surrounding Harris' death was limited, as Manigan answered that he did not know that Harris was shot on the steps of Johnson's house. Although the prosecutor expressed skepticism that Manigan would not have known the location where his friend was shot, there was no further mention of Harris' shooting or attempt to show Manigan's bias during the trial, and Harris' death was not mentioned by the government in its closing argument. Further, it cannot be said that the prosecutor's suggestion that Manigan's testimony for the defense was biased against the prosecution of the killer of Tonya Johnson substantially swayed the jury in light of ample evidence that it was appellant who shot Johnson. Manigan was otherwise heavily impeached on the basis of a prior conviction for a violent offense, his friendship with appellant, his refusal to identify a photo of him taken at the crime scene, and contradictions in his testimony with that of other witnesses. Therefore, his testimony was significantly weakened for the jury. Four eyewitnesses, on the other hand, testified consistently as to the clothing and mask worn by the shooter, as well as the gun used in the commission of the

---

ernment's proffer for the bias cross-examination as "speculative" and the trial judge herself sought to clarify the government's factual proffer.

crime. These witnesses also testified that the shooter entered an alley, from which two police officers observed appellant emerge at the opposite end, stuffing something down his waistband. As the officers pursued appellant on foot, one officer observed appellant place "a gun and some kind of mask on top of it" on the ground. The gun—with five spent shell casings—was seized and appellant arrested within minutes of five shots being fired at Tonya Johnson. That evidence presented a seamless recounting of the shooting with appellant as the shooter, and we conclude that the trial court's error in permitting the bias cross-examination of Manigan was harmless. *See Mercer,* 724 A.2d at 1197.

■ We also conclude that appellant's challenge on "other crimes" evidentiary grounds to the government's cross-examination, both to the series of questions concerning Manigan's actions prior to the shooting and to the bias inquiry itself, is meritless. Appellant was in no way implicated in the murder of Harris and, as mentioned above, Harris' murder was not raised again during trial nor during closing argument. As for the series of questions relating to Manigan's actions moments before the shooting, they were not objected to by defense counsel and merely highlighted contradictions between Manigan's direct testimony and that of other witnesses. Two government witnesses testified that Manigan was near a phone booth at the crime scene, looking up the street, and that he dashed across the street just before the shooting began. The prosecu-

tor's questioning of Manigan in relation to his actions at that time properly sought to confirm these government witnesses' observations, already introduced into evidence. There was no plain error where the trial court failed to *sua sponte* cut short an entirely permissible line of questioning. *See, e.g., Thomas v. United States,* 772 A.2d 818, 822 (D.C.2001) (because defendant failed to object, allegedly improper cross-examination by the prosecutor reviewed for plain error). The allegedly impermissible suggestion made to the jurors based on Manigan's actions—that Manigan and appellant conspired to kill Johnson—was not evidence of other crimes. Rather, it was *direct* evidence, albeit uncharged, of the crime for which appellant was on trial. *See (William) Johnson v. United States,* 683 A.2d 1087, 1098 (D.C.1996) (en banc).

### III.

■ Appellant also argues that the trial court erred in failing to hold an evidentiary hearing on the factual issue of whether his trial counsel, Retna Pullings, was under the effect of drugs and suffered from psychiatric problems during trial.[9] Under the oft-stated two prong test established in *Strickland,* appellant must show (1) deficient performance by his trial counsel, and (2) prejudice traceable to his trial counsel's deficiencies. *See Zanders v. United States,* 678 A.2d 556, 569 (D.C. 1996) (citing *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). We have recognized that there is a statutory presumption in favor

---

9. In his brief, appellant also recites the trial court's denial of his initial *pro se* § 23–110 motion (No. 97–CO–1621) based on claims of double jeopardy and the denial of his later motion (No. 99–CO–1661) alleging ineffective assistance of counsel on four additional grounds: (1) failure to impeach a government witness with a prior conviction, (2) failure to object to allegedly improper cross-examina-

tion of Manigan, (3) failure to object to admission of evidence on chain of custody grounds, and (4) failure to move to strike a juror who informed the trial court that she knew a government witness. We do not address these claims as the trial court denied these contentions on the merits and appellant does not press them on appeal.

of a hearing on a § 23–110 motion, *see* § 23–110(c); *Dobson v. United States,* 711 A.2d 78, 83 (D.C.1998), but we also have "stated consistently that no hearing is required where defendant's motion 'consists of (1) vague and conclusory allegations, (2) palpably incredible claims, or (3) allegations that would merit no relief even if true.'" *Courtney v. United States,* 708 A.2d 1008, 1011 (D.C.1998) (quoting *Ready v. United States,* 620 A.2d 233, 234 (D.C. 1993)).

In *Payne v. United States,* 697 A.2d 1229 (D.C.1997), we held that evidence of drug use by trial counsel is not *per se* evidence of ineffective assistance of counsel. *See id.* at 1232. We instead consider whether trial counsel's performance was deficient and whether that deficiency prejudiced the defendant.[10] *See id.* In the present case, the trial court requested that the government respond to appellant's discovery request regarding Pullings' alleged drug use and psychiatric problems during her representation of appellant at trial in 1997. After considering the government's

reasoning that the drug usage and psychiatric problems occurred well after trial, in 1999, and the lack of evidence presented by appellant demonstrating that trial counsel was deficient, the court ruled it would "not permit [appellant] to delve into the irrelevant question of trial counsel's alleged drug problem." We agree that no hearing was necessary where the basis of appellant's argument rested solely on allegations of Pullings' drug use and psychiatric treatment in 1999, and where appellant failed to point to any particular examples of alleged deficient representation by his counsel which prejudiced the outcome of his trial.

Accordingly, for the foregoing reasons, the judgment on appeal is *Affirmed.*

---

10. This court has not specifically addressed whether evidence that trial counsel had psychiatric problems is *per se* prejudicial to a defendant, but absent egregious circumstances, we see no reason why mental illness should be treated any differently than drug use or any other condition that could—but need not—impair counsel's performance. *Cf.* *Mickens v. Taylor,* —— U.S. ——, ——, 122 S.Ct. 1237, 1245, 152 L.Ed.2d 291 (2002) (trial court's failure to inquire into defense counsel's previous representation of murder victim did not compel automatic reversal or relieve defendant's burden of establishing "that the conflict of interest adversely affected his counsel's performance").