IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR SUSSEX COUNTY

W & C CATTS FAMILY
LIMITED PARTNERSHIP,
Property owners in the City of
Dewey Beach,

      Appellants,

v.

THE TOWN OF DEWEY BEACH and
THE BOARD OF ADJUSTMENT OF
THE CITY OF DEWEY BEACH,
DELAWARE, a Delaware
Municipal corporation,

      Appellees.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

C.A. No. S18A-05-001 RFS

## MEMORANDUM OPINION

Date Submitted: August 20, 2018
Date Decided: November 30, 2018

*Upon Appeal from a Decision of the Dewey Beach Board of Adjustment.*
*Affirmed.*


John W. Paradee, Esq., Glenn C. Mandalas, Esq., and Daniel F. McAllister, Esq.,
Mandalas & Brockstedt, 6 S. State Street, Dover, Delaware 19901, Attorneys for Appellant

Veronica O. Faust, Esq., Morris James, LLP, 19339 Costal Highway, Suite 300,
Rehoboth Beach, Delaware 19971; and Michael J. Hoffman, Esq., Tarabicos Grosso, LLP, 100
W. Commons Blvd., Suite 415, New Castle, Delaware 19720, Attorneys for Appellees

**STOKES, R. J.**

## I.    INTRODUCTION

Presently before the Court is an appeal from a decision of the Dewey Beach Board of Adjustment ("BOA" or "Board") brought by W&C Catts Family Limited Partnership ("Appellant" or "Catts"). Appellant seeks to reverse the BOA's decision that Appellants have abandoned a non-conforming use of their property. Appellants also seek to reverse the BOA's decision based on the BOA's flawed interpretation of the Flood Damage Reduction Ordinance and § 185-59 of the Dewey Beach Code. The Court AFFRIMS the decision of the BOA for the reasons discussed below.

## II.    FACTS

Catts is the owner of the property in dispute, Ed's Chicken and Crabs ('Ed's Chicken") located at 2200 Coastal Highway, Dewey Beach, Delaware. The property is located within Resort Business District 2 zoning district and also within the AO-2 floodplain district as described in Chapter 101 of the Delaware Code.

On August 9, 2016, a drunk driver crashed into Ed's Chicken, causing a fire which completely destroyed the structure located on the property. Catts then submitted a letter to the Town of Dewey Beach Building Inspector, requesting a determination of non-conforming use for the property on the basis that Catts used the property, prior to its destruction by fire, as an outdoor eatery and never abandoned this legal non-conforming use. The Town of Dewey Beach ("Town") responded that Catts had abandoned the non-conforming use once Catts began using structures with indoor cooking facilities. In November of 2017, Catts began discussing with the Town construction within the former structure's existing building footprint. Catts submitted a building permit for a structure of essentially the same configuration as the one that had been

1

destroyed by the fire. The Town's Building Inspector denied the permit on the basis that the plans submitted did not conform with the standards required for the AO-2 floodplain district.

Catts appealed both of these decisions and requested a hearing before the BOA. At the hearing, Ed Riggin ("Riggin") testified on behalf of Catts. Riggin, the former proprietor and namesake of Ed's Chicken, testified that he started Ed's Chicken in 1978 or 1979. He also testified that Ed's Chicken exclusively served chicken cooked outside for the first five years that Ed's Chicken was open, through the mid 1980's. At some point in the mid 1980's, Riggin built a shack and put in picnic tables. Riggin further testified that Ed's Chicken hosted at least two or three pig roasts over the years, and furthermore that approximately five years ago, when a fire destroyed the hood system to the indoor stove, Riggin cooked chicken outside for an entire summer. Riggin also testified that he never intended to cease cooking outdoors and that no one from the Town told him that by building an indoor kitchen and applying for a business license as an "eatery" he would abandon his right to cook outdoors.

With respect to outdoor cooking Riggin confirmed that Ed's Chicken *occasionally* would return to its open air roots and prepare food on outdoor grills whenever other equipment was unusable. Riggin further stated, "it wasn't needed" when asked if he stopped cooking outdoors when the signature shack, with indoor cooking equipment, and picnic tables were erected in the mid 1980's.

Rusty Catts ("Rusty") also testified on behalf of Catts. Rusty testified that his father and Riggin went into business with one another in the late 70's and early 80's. Rusty's father was a silent partner in the restaurant business and Riggin was the managing partner. After his father's death, Rusty made an agreement with Riggin that Rusty would become a landlord only and Riggin would own Ed's Chicken and mechanical equipment inside of Ed's Chicken. Rusty

testified, based on his personal knowledge, that outdoor cooking occurred on the property on a periodic basis. Furthermore, Rusty defined how often a periodic basis was as, "because of fire", "we did a pig", and "whenever we felt the need to".

After hearing all of the evidence presented the BOA upheld the Building Inspector's decisions that Catts had abandoned the non-conforming use for outdoor food preparation and that the reconstruction of the building must comply with Chapter 101 or § 101-12[1] of the Dewey Beach Code "the Code". The Board reasoned that Catts abandoned the non-conforming use because (1) Catts intended to abandon outdoor cooking when Catts erected walls, changed the character of the business, and was licensed as an eatery; and (2) that Catts abandoned the use of open air cooking for a continuous period of at least one year when the business moved its food preparation to an indoor cooking facility, even though there were occasional examples of open air food preparation since the late 1980s.

In making its determination the BOA determined that Chapter 101, the Flood Plain Ordinance which requires minimum building elevation levels for building constructed in FEMA flood plain designated areas, applies notwithstanding § 185-59[2] of the Code. The BOA reasoned

---

[1] The Town of Dewey, Delaware, Municipal Code § 101-12 states in relevant part:
    A. Structures existing in any special flood hazard area prior to the initial enactment of this chapter (June 18, 1982), but which are not in conformance with these provisions, may continue to remain subject to the following:
        2. Any modification, alteration, addition, reconstruction, repair, or improvement of any kind to an existing structure, the cost of which equals or exceeds 50% of the market value, **shall only be undertaken** in full compliance with the provisions of this chapter.

[2] The Town of Dewey, Delaware, Municipal Code art. IX, § 185-59 states in relevant part:

If a nonconforming building is damaged by fire, storm, infestation, or other peril not caused intentionally by the property owner, it may be repaired or reconstructed to essentially the same configuration as existed prior to the damage, provided that application for all required building permits be made within one year and six months of the date of the damage. If a different configuration or an expansion of the original building is proposed, it must conform to all applicable regulations, including all applicable setbacks, height and elevation requirements

    B. Except that in the process of repairing or reconstructing a residential use structure located in a flood-prone area (e.g. a FEMA-designated VE, AE, or AO flood zone) that does not conform to the required setbacks in any respect and does not meet the Town building elevation standards and has suffered substantial damage,

3

that the laws of statutory interpretation should apply in order to decide whether § 185-59, § 101-12, or both statutes should govern the reconstruction of the structure. The BOA stated that it must give effect to the intent of the legislators and determine whether the statute is ambiguous. It also stated that where a statute is unambiguous the plain meaning of the statutory language controls and when a statute is ambiguous the statute must be construed as a whole, in a way that gives effect to all of the provisions of the statute and avoids absurd results. Furthermore, it stated that if there are two reasonable interpretations of the statute, the interpretation to follow is the one that favors the landowner controls. Ultimately, the BOA decided that § 101-12 controlled because § 101-12 was adopted after § 185-59, the legislative intent of the Town was for § 101-12 to control if there were conflicting statutes, and that § 101-12 and § 185-59 could be read as a whole in order to avoid absurd results. Finally, the BOA reasoned that § 101-12 and § 185-59 could be read as a whole because § 101-12 operates to provide an additional requirement that any reconstruction of 50% or more of a building under § 185-59 must comply with the applicable height and elevation requirements of § 101-12 because that reading of the ordinance would give effect to all of the statutory provisions and avoid absurd results.

## III.    STANDARD OF REVIEW

The standard of review for appeals from a Board of Adjustment decision is limited to the correction of errors of law and determination of whether substantial evidence exists in the record to support the Board's findings of fact and conclusions of law.[3] Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.[4] If the

---

said structure shall be elevated to the relevant minimum building-elevation requirement as per § 185-60B of this chapter

[3] *Janaman v. New Castle County Bd. Of Adjustment*, 364 A. 2d 1241, 1241 (Del. Super. Ct. 1976).
[4] *Miller v. Bd. Of Adjustment of Dewey Beach*, 1994 WL 89022, at *2 (Del Super. Ct. Feb 16, 1994).

Board's decision is supported by substantial evidence, a reviewing court must sustain the Board's decision even if such a court would have decided the case differently if it had come before it in the first instance.[5] "The burden of persuasion is on the party seeking to overturn a decision [based on a question of fact] of the Board to show that the decision was arbitrary and unreasonable."[6] Questions of law are reviewed *de novo*.[7] In its appellate review, the Superior Court after examining the record may "reverse or affirm, wholly or partly, or may modify the decision brought up for review."[8]

## IV.   DISCUSSION

### a.   Abandonment

#### i.   Catts Established a Non-Conforming Use of Outdoor Open Air Food Preparation.

The first issue in determining abandonment is whether Catts has established the non-conforming use of outdoor open air food preparation. The initial burden of proof is on the property owner to establish a non-conforming use.[9] It is clear that Catts has met this initial burden and has established the non-conforming use.

The record clearly shows that Ed's Chicken served food directly from an outdoor barbeque pit and grill until the mid-1980s. Furthermore, the BOA has confirmed in its decision that Catts has established a legal non-conforming use by stating, "the record clearly establishes that while this use became non-conforming when the town was incorporated in 1981. . . ."[10] Appellees assert that Catts failed to present evidence that established a non-conforming use

---

[5] *Mellow v. Bd. Of Adjustment of New Castle County*, 565 A. 2d 947, 954 (Del. Super. Ct. 1988), *aff'd*, 567 A. 2d 422 (Del. 1989).
[6] *Id.* at 556.
[7] *Teckstrom, Inc. v. Savla*, 2006 WL 2338050, at *4 (Del. Super. Ct. 2006).
[8] 22 *Del. C.* § 328(c).
[9] *Dover Products v. Turner*, 1978 WL 22004, at *3 (Del. Ch. 1978).
[10] Compendium of Documents Constituting the Stipulated Record, Exhibit 20 at 4.

relying on open-air food preparation. This assertion is contrary to undisputed facts, the BOA's decision, and the fact that the Appellees, in their own brief, admit that Catts did establish a legal non-conforming use for relying on open-air food preparation. Based on these facts it is clear that Catts has established a legal non-conforming use for open-air food preparation.

### ii. The Board Relied on Substantial Evidence to Determine that Catts Abandoned the Non-Conforming Use of Open Air Outdoor Food Preparation for a Period of at least One Year.

As mentioned above the initial burden of proof is on the property owner to establish a non-conforming use.[11] But, once the property owner has met this initial burden, as Catts has here, the burden then shifts to the Town to prove that the property owner has abandoned the non-conforming use.[12] Abandonment of a non-conforming use can be found under the following two circumstances: (1) where there is intent by the property owner to abandon the non-conforming use with an accompanying clear act, or failure to act, to demonstrate such an intent; or (2) abandonment is presumed where a property owner terminates a non-conforming use for a period in excess of the time specified in the zoning ordinance.[13] The Town Code provides a period of one year in determining abandonment of a non-conforming use.[14] The testimony of Riggin was enough to provide the Board with substantial evidence that the Town established that the non-conforming use of outdoor open-air food preparation had been abandoned for a continuous period of at least one year.

Riggin was the proprietor of the restaurant from the early 1980's, at which time Ed's Chicken relied solely on outdoor open-air food preparation, through when the Town was

---

[11] *Dover Products*, 1978 WL 22004, at *3.
[12] *Id.*
[13] *Hamm v. City of Wilmington Zoning Bd. Of Adjustment*, 2010 WL 547413, at *4 (Del. Super. Ct. 2010).
[14] The Town of Dewey, Delaware, Municipal Code art. IX, § 185-58.

6

incorporated, at which time outdoor open-air food preparation became a permissible non-conforming use, and up until the fire in 2016. As the proprietor of the restaurant Riggin was in the best position to testify to the nature of the business from the relevant period of 1980-2016. Per Riggin's testimony, in the late 1980's, Ed's Chicken incorporated an indoor kitchen facility. When asked if he continued to cook outdoors after the completion of the indoor kitchen Riggin responded, "there was no need to". In addition to this testimony, Riggin stated that he cooked a few pig roasts over the years outdoors, that outdoor cooking occurred on a periodic basis, and that he cooked outside for an entire summer five or six years ago due to a kitchen fire. Furthermore, the business substantially changed when Ed's Chicken constructed an indoor kitchen. The business transformed from one that solely relied on outdoor cooking to a business that would use outdoor cooking for special occasions such as pig roasts or in the event of indoor equipment failure. The nature of Ed's Chicken became an eatery as defined by the Town Code.[15]

Catts argues that the BOA has flipped the burden onto him to prove that he has not abandoned the non-conforming use of open air food preparation. But, the BOA has met its burden of *affirmatively proving abandonment*[16] through the testimony of Riggin. The BOA is not required to provide its own witness to demonstrate that the non-conforming use was abandoned. Riggin's own testimony as outlined above established the substantial evidence needed to conclude that the non-conforming use of outdoor open-air food preparation had been abandoned for a period of at least one year and that the nature of the business and non-conforming use had changed. Based on this testimony, it is clear to see that the nature of the

---

[15] This Court is not relying on the fact that Ed's Chicken was granted the license of an eatery to establish that Ed's Chicken had become an eatery. The Court merely is looking at the nature of the business of Ed's Chicken and confirming that when an indoor kitchen facility was added, Ed's chicken began to operate as an eatery as defined by the Town Code, which is confirmed by Riggin's testimony that he "no longer needed to [cook outdoors]" once the kitchen was built.

[16] *Hamm*, 2010 WL 547413, at *4.

7

nonconforming use has changed since the building of an indoor kitchen facility, making this case similar to *New Castle County v. Harvey.*[17] Furthermore, the testimony provides substantial evidence that the BOA could find that the non-conforming use of outdoor open-air food preparation was altogether abandoned for a continuous period of 1 year, despite periodically cooking outdoors for special occasions such as a few pig roasts and in the event of indoor kitchen equipment failure.

Next, Catts asserts that the BOA impermissibly relied on the receipt of a business license as an eatery to determine that the nature of Ed's Chicken had changed. Catts contends that the BOA's reliance on the business license as an eatery results in legal reversible error. It is clear, from the BOA's written decision, that "the *actions* of the property owner in erecting walls and changing the character of the business evinced an intent to convert [the business] from a food service business with open air food preparation to a business with indoor kitchen facilities". This language makes it clear that the BOA made its decisions based off of Catts' actions and not his business license. Furthermore, the testimony from Riggin clearly established that the nature of the business changed when an indoor kitchen facility was created as the business changed from entirely cooking outdoors to periodically cooking outdoors for special occasions or in the event of kitchen equipment failure. Therefore, the BOA did not rely on the property owner's business license in making it's decision, but rather it permissibly relied on the actions of the property owner in establishing that the nature of the business changed.

Finally, Catts contends that the BOA presented no evidence that Catts intended to abandon the legal non-conforming use of outdoor cooking. Catts states that Riggin's testimony

---

[17] 315 A. 2d 616 (Del. Ch. 1974)(holding that the nature of the defendant's business had changed from garbage to bussing, and therefore the nature of the nonconforming use had changed, and that a new or substituted use, differing in quality or character, is a prohibited use unless the ordinance otherwise provides.).

"I did not intend to abandon the non-conforming use of outdoor cooking" is the only evidence that the BOA can permissibly look at to show abandonment. As mentioned above, the Delaware Superior Court has held that abandonment of a non-conforming use can be found where the property owner intended to abandon the non-conforming use, or where the property owner has abandoned the non-conforming use for a period of time specified in the zoning ordinance, here one year.[18] The BOA was correct in stating that the actions of building walls and creating an indoor cooking facility evinced an intent to change the nature of the business. Furthermore, Riggin's testimony corroborates the fact that the business had changed when the indoor cooking facilities were constructed. The Town need not prove both abandonment and intent, but rather only abandonment for a period of 1 year or intent to abandon.

The BOA has relied on the substantial evidence of Riggin's testimony in determining that the non-conforming use of outdoor cooking has been abandoned for a period of 1 year. The BOA has further relied on the substantial evidence of the actions of Ed's Chicken in erecting walls and creating an indoor kitchen that the nature of the business has substantially changed since its inception and Ed's Chicken intended to abandon outdoor cooking.

### b. Interpretation of Town Ordinances

#### i. Standard of review

As previously noted questions of law are reviewed *de novo*.[19] The standard of review that the Court will apply to the question of interpretation of a zoning ordinance is *de novo* review.[20] A Board decision which reviews clear and unambiguous ordinance, but misinterprets

---

[18] *Hamm*, 2010 WL 547413, at *4 (Del. Super. Ct. 2010).
[19] *Teckstrom, Inc.*, 2006 WL 2338050, at *4 (Del. Super. Ct. 2006).
[20] *Oceanport Ind. v. Wilmington Stevedores*, 636 A. 2d 892, 899 (Del. 1994).

9

the language, may be subject to reversal as an error of law.[21] In that case, "it is the intent of the ordinance and the plain meaning of its language that are controlling."[22] Furthermore, the Board's interpretation of an ambiguous ordinance "should be given great weight and should not be overturned unless contrary to law."[23] An ambiguous ordinance is one that is reasonably interpreted two different way or renders an absurd or unreasonable result.[24] Additionally, when ambiguities arise, the Court "must keep in mind that zoning laws are to be interpreted in favor of the occupants of the land."[25]

### ii. The Board of Adjustment had the authority to consider Chapter 101 of the Town Code.

Catts contends that the BOA is only endowed with limited jurisdiction.[26] Specifically, Catts argues that the BOA has no jurisdiction to act outside the parameters of 22 *Del. C.* §§ 327(a)(1)[27] and 301[28], and can only hear zoning issues.[29] Catts argues that by interpreting § 101-12 alongside of § 185-59 the BOA exceeded its jurisdiction because § 101-12 is not a zoning ordinance. Catts points out that Chapter 101 of the Code, which contains § 101-12, is not included in the Town's zoning chapter, is named the "Flood Damage Reduction Ordinance", and

---

[21] *Kulin Living Trust v. Board of Adjustment of Town of Fenwick Island*, 2005 WL 1077742 (Del. Super 2005).
[22] *4th Generation, Ltd. v. Board of Adjustment*, 1987 WL 14867 (Del. Super Ct. 1987).
[23] *Id.*
[24] *Dir. Of Revenue v. CNA Holdings*, 818 A. 2d 172, 175-76.
[25] *Mergenthaler v. State*, 293 A. 2d 287, 288 (Del 1972).
[26] *Jenny v. Durham*, 707 A. 2d 752, 756 (Del. Super. Ct. 1997), *aff'd*, 696 A. 2d 396 (Del. 1997).
[27] 22 *Del. C.* § 327 states in relevant part:
    (a) The board of adjustment may:
        (1) Hear and decide appeals where it is alleged there is error in any order, requirement, decision or determination made by an administrative official in the enforcement of this chapter or of any ordinance adopted pursuant thereto;
[28] 22 *Del. C.* § 301 states:

    For the purpose of promoting health, safety, morals or the general welfare of the community, the legislative body of cities and incorporated towns may regulate and restrict the height, number of stories and size of buildings and other structures, percentage of lot that may be occupied, the size of yards, courts and other open spaces, the density of population, and the location and use of buildings, structures and land for trade, industry, residence or other purposes.
[29] *Id.* at 757.

is not named as a zoning ordinance. Catts further states that local ordinances do not supersede, side-step or otherwise substitute for legislative jurisdictional requirements.[30] Catts contends that the BOA is limited to applying only § 185-59 to the present case. Catts then cites to *Arbour Park Civic Ass'n, Inc. v. Bd. Of Adjustment of City of Newark*[31] to demonstrate what a zoning ordinance is. The Court, in *Arbour Park*, held that the Board did not have jurisdiction to grant a variance where sidewalks would not be required because the construction of sidewalks is not a subject of zoning, but rather a subdivision regulation.[32] The Court cited to out of state cases to define what a zoning issue is.[33]

The BOA had the jurisdiction to determine the applicability of Chapter 101 and § 185-59 of the Town Code as they are applied to this matter. As mentioned above by Catts the BOA may hear appeals pursuant to 22 *Del. C. §* 327(a)(1) and *22 Del. C. §* 301, but the BOA may also hear appeals pursuant to 22 *Del. C. §* 324.[34] Interpreting all of the parts as a whole, in viewing the applicable case law and the statutes above, the decision of the building inspector is within the reviewing authority of the BOA.[35] It is clear under the language of 22 *Del. C. §* 324 that the

---

[30] *Jenney,* 707 A. 2d at 752.

[31] 1969 WL 99824, at *4 (Del. Super. Ct. 1969).

[32] *Id.*

[33] See *DiPalma v. Zoning Board of Review,* 50 A. 2d 779 (R.I. 1947) (holding that the erection of gasoline pumps upon a sidewalk or curb was a matter solely within the power of the town and the zoning board did not have jurisdiction over such a question.); *Warren v. Marion County,* 353 P. 2d 257 (Or. 1969) (holding that building code regulations, involving less serious restrictions upon the property owners' use, were not zoning issues); *Town of Jaffrey v. Heffernan,* 183 A. 2d 246 (N.H 1962) (holding that an ordinance requiring dwelling houses erected after the enactment of an ordinance to have a minimum setback of 30 feet from any public highway was not a zoning ordinance, but rather a "setback" regulation within the general police power).

[34] 22 *Del. C. §* 324 states in relevant part:

> Appeals to the board of adjustment may be taken by any person aggrieved or by any officer, department, board or bureau of the municipality affected by any decision of the administrative officer.

[35] See *Brandywine Park Condominium Council v. Members of City of Wilmington Zoning Board of Adjustment,* 534 A. 2d 286 (Del Super. Ct. 1987)(holding that an erosion control plan is within the reviewing authority of the Board because the Board accepts appeals from any decision of an administrative officer)

Board accepts appeals from *any decision* of an administrative officer. Because the Building Inspector is an administrative officer the BOA rightfully considered this appeal.

Furthermore, the height requirements implemented by Chapter 101 make it a zoning ordinance, despite Catts' attempts to define Chapter 101 as something other than a zoning ordinance by citing *Arbour Park*. Here, the elevation requirements of Chapter 101 differentiate this case from the construction of sidewalks as in *Arbour Park*. The enabling legislation for Town of Dewey Beach Code § 185 (Zoning) is authorized by 22 *Del. C. §* 301. 22 *Del. C. §* 301 states, "For the purpose of promoting health, safety, morals or the general welfare of the community, the legislative body of cities and incorporated towns *may regulate and restrict the height*, number of stories and size of buildings and other structures . . . ." The minimum height requirements set forth in the Flood Plain Ordinance, Chapter 101, clearly falls within the definition of "zoning" as defined by the language of 22 *Del. C. §* 301, and are not similar to the "setback regulations" or "subdivision regulations" mentioned in *Arbour Park*.[36] Despite Chapter 101 not having the specific title of "zoning ordinance" the elevation requirement does in fact create a zoning ordinance.

Because Chapter 101 is a zoning ordinance and the BOA was hearing a decision from an administrative officer the BOA had the authority to consider Chapter 101 in hearing this appeal.

### iii. The Board of Adjustment Correctly Interpreted Chapters 101 and 185 of the Town of Dewey Beach Code.

The final issue is whether the BOA correctly interpreted § 185-59 and § 101-12 correctly. The BOA found that, at the very least, there is a conflict between the two provisions and that the BOA had to ascertain the legislative intent of the Town Council. In reaching its decision the

---

[36] *Arbour Park*, 1969 WL 99824 at *4.

BOA concluded that the legislative intent of the Town Council in adopting § 101-12(B)(2)'s requirement that structures reconstructed at a cost equal or exceeding 50% of the market value of the structure comply with the height provisions of Chapter 101 was for this requirement to apply notwithstanding § 185-59. Chapter 101 was adopted after § 185-59 and in amending Chapter 101 on December 13, 2014, the Town Council expressly provided that, "[a]ny and all ordinances and regulations in conflict herewith are hereby repealed to the extent of any conflict." Moreover, § 101-5 provides, "[t]hese regulations are not intended to repeal or abrogate any existing ordinances including subdivision regulations, zoning ordinances, or building codes[; but] [i]n the event of a conflict between these regulations and any other ordinance, the more restrictive shall govern." Further, the BOA stated, that construing the Town Code as a whole and in a way that gives effect to all of the statutory provisions avoids absurd results and superfluous language. Finally, the BOA concluded that while § 185-59 allows reconstruction of the structure to essentially the same configuration, thereby allowing encroachment into building setbacks, as applicable, Section 101-12(B)(2) operates to provide an additional requirement that any such reconstruction comply with the requirements of Chapter 101, including applicable height and elevation requirements.

Catts contends that the plain language and legislative history of § 185-59 evince a clear intent to create an exception to § 101-12(B)(2). By not allowing Catts to reconstruct his structure to the same exact configuration, Catts argues that the BOA has repealed § 185-59. Catts contends that after broadly allowing for the reconstruction of existing non-conforming structures to essentially the same configuration, § 185-59(A) contains a single exception for residential structures in designated flood zones. Catts argues that § 185-59 creates an exception to compliance with the Town Code and that § 185-59(A) creates an exception to the exception, that is applicable only to

residential properties, in designated flood zone areas, by requiring that the properties be elevated to the minimum building elevation requirements of § 101-12(B)(2). Catts contends that the reconstruction of residential non-conforming property is the only type of property that must comply with § 101-12(B), and more specifically that commercial non-conforming structures do not have to comply to § 101-12(B).

Furthermore, Catts argues that *expressio unius est exlusio alterius* is particularly applicable in this case.[37] Catts argues that because the amendment to § 185-59 was only applied to residential structures and not all structures that the omissions were intended by the Town. Next, Catts argues that the BOA's reading of § 185-59 creates surplusage and that all of § 185-59(A) would be considered surplusage. Catts then argues that § 185-59 and § 101-12(B)(2) are not in conflict. Catts contends that the BOA focused solely on § 101-12 and its legislative history, while it completely ignored § 185-59. Catts argues that because the ordinances are not in conflict the BOA made a legal error when it looked into the legislative history in determining which statute applied. Catt instead contends that the BOA should have applied the principles of statutory interpretation. Finally, Catts contends that even if § 185-59 and § 101-12 are in conflict the BOA did not reconcile the two ordinances properly. Catts contends that if there are two reasonable interpretations of the ordinance, the interpretation that favors the landowner controls[38] and that the more specific ordinance should apply over the more general ordinance.[39] Catts argues that the BOA did not find ambiguities in his favor and that § 185-59 is more specific than § 101-12.

---

[37] *Leatherby v. Greenspun,* 939 A. 2d 1284, 1291 (Del. 2007) (defining *expressio unius est exclusio alterius* as applied to statutory interpretation as "[w]here a form of conduct, the manner of its performance and operation, and the persons and things to which it refers are affirmatively or negatively designated, there is an inference that all omissions were intended by the legislature*").*

[38] *Chase Alexa, LLC v. Kent County Levy Court,* 991 A. 2d 1148, 1152 (Del. 2010)(citations omitted).

[39] *Shellburne Civic Ass'n Inc. v. Brandywine Sch. Dist.,* 2006 WL 4782500, at *3 (Del. Ch. 2006).

The Town on the other hand contends that § 185-59 was amended to restrict residential structures to the minimum elevation required by Chapter 101. The Town argues that § 185-59 was amended in the wake of resident opposition to the Town's interpretation of the interplay between the two ordinances in the case of *Laird v. Board of Adjustment of the Town of Dewey Beach*.[40] The Building Inspector in *Laird* concluded that § 185-59, when read in conjunction with Chapter 101, restricted the property owners' ability to elevate their structure beyond the minimum elevation required by Chapter 101. The Board reversed the decision of the Building Inspector and the Superior Court affirmed the decision of the Board, albeit for different reasons than those stated by the Board.[41] The Court held that the Building Inspector's conclusion, that raising a home to the minimum requirements of Chapter 101 did not constitute a reconfiguration of the homes parts but raising the structure a few feet above the minimum requirement did constitute a reconfiguration of the homes parts, did not make any sense.[42] The Court then stated that the Dewey Beach Code did not define what a reconfiguration was, used the common definition of configuration[43], and held that the Court did not see how the mere raising of a structure amounts to a change in the arrangement of its parts.[44] The Town further argues that *Laird* stands for the proposition that non-conforming structures reconstructed in the Town must comply with the height requirements of Chapter 101 and that an elevated structure would be reconstructed to essentially the same configuration.

The Town contends that Catts misinterprets the plain language of § 185-59, and that the plain language, in light of *Laird*, restricts residential properties to the relevant minimum building

---

[40] 2014 WL 6886953 (Del. Super. Ct. 2014).
[41] *Id.* at *2.
[42] *Id.* at *3.
[43] Merriam-Webster's Ninth New Collegiate Dictionary 275 (9th ed. 1986) (defining configuration as, "a relative arrangement of parts or elements"
[44] *Laird*, 2014 WL 6886953 at *3.

15

elevation in spite of the holding in *Laird*. Furthermore, the Town contends that it clearly did not intend for only residential structures to be subject to the minimum height requirements of Chapter 101. Particularly, in light of the amendments to Chapter 101 by way of Ordinance 710, the plain language illustrates that the intent was for all structures to continue complying with Chapter 101, with the caveat that residential property owners cannot elevate their structures beyond what is minimally required. Catts disputes the Town's reading of *Laird* and argues that the Town and the Board have committed inverse error in interpreting the relevant statutes. Catts contends that just because Chapter 101 provides no exception to the requirements of § 185-59, it does not follow that § 185-59 provides no exception to Chapter 101.

Next, the Town contends that § 185-59 and § 101-12 must be read in conjunction with one another. The Town argues that Catts reading of the ordinances would wholly negate Chapter 101 and create absurd results. Further the Town contends to the extent that there is ambiguity, the ambiguity is resolved by legislative history, which unequivocally requires compliance with the minimum height elevation requirements of Chapter 101. Finally, the Town agrees with Catts that § 101-12(B)(2) and § 185-59 are harmonious. But, the Town argues that if there is a conflict with the two ordinances, then § 101-12(B)(2) would supersede § 185-59 because Chapter 101 has clearly laid out that "in the event of a conflict between these regulations and any other ordinance, the more restrictive shall govern"[45] and that "any and all ordinances and regulations in conflict herewith are hereby repealed to the extent of the conflict".[46]

To interpret the ordinances at hand the Court must determine whether the ordinances are clear or ambiguous. An ambiguous ordinance is one that is reasonably interpreted two different

---

[45] The Town of Dewey Beach, Delaware, Municipal Code art. I, § 101-1.5.
[46] *Id.* at 101-8.3 § 3.

ways or renders an absurd or unreasonable result.[47] As mentioned above, where a BOA decision that reviews clear and unambiguous ordinances, but misinterprets the language, the BOA may be reversed as an error of law and the intent of the ordinance and the plain meaning of its language are controlling.[48] But, the Board's interpretation of an ambiguous zoning ordinance should be given great weight and should not be overturned unless contrary to law.[49] However, the Court is free to correct clear errors of law and must keep in mind that ambiguous zoning ordinances are to be interpreted in favor of the land owner.[50]

As both parties have agreed it seems clear that the plain language of § 185-59 and § 101-12 can be read in harmony. The relevant language in § 185-59 is that non-conforming structures, that have been destroyed at no fault to property owner, may be reconstructed to "essentially the same configuration". As the Town has argued, the Court in *Laird*, has defined what a configuration or reconfiguration of a building would be. Specifically, the Court held that the mere raising of a structure did not amount to a change in the arrangement of its parts, and therefore a building could be elevated to the minimum height requirements of Chapter 101 while still conforming to the requirement of § 185-59 that the property may be reconstructed to essentially the same configuration. This Court follows the Court's holding in *Laird*, and determines that Catts can raise his structure to the minimum height requirements set forth in Chapter 101 while still complying with the "essentially the same configuration" requirement of § 185-59. Therefore, the BOA's conclusion that "while § 185-59 allows reconstruction of the structure to essentially the same configuration, thereby allowing encroachment into building setbacks, as applicable, § 101(B)(2) operates to provide an additional requirement that any such

[47] *Dir. Of Revenue*, 818 A. 2d at 957.
[48] Kulin, 2005 WL 1077742 at *2.
[49] *4th Generation, Ltd.*, 1987 WL 14867 at *7.
[50] *Mergenthaler*, 293 A. 2d at 288.

reconstruction comply with the requirements of Chapter 101, including all applicable height and elevation requirements", is correct.

However, assuming arguendo that § 101-12 and § 185-59 were in conflict with one another, Chapter 101 would apply because the Town intended for it to apply and reading the statutes in the manner Catts suggests would create an absurd result. As mentioned above great weight would be given to the Board's interpretation of an ambiguous ordinance.[51] Catts' interpretation of the statutes would have of forcing residential homes complying with the elevation requirements of Chapter 101, but perplexingly would not hold commercial reconstruction to the same standards. The purpose of elevating structures in flood prone areas is to protect the people of Dewey Beach and to reduce insurance premiums for the people of the Town living in those areas.[52] It is clear that the amendments to Chapter 101 and § 185-59 were the Town's response to the Court's decision in *Laird* and clearly are not intended to grant an exclusion for non-conforming commercial businesses to reconstruct destroyed property below the minimum flood plain level. Interpreting the ordinances in the way urged by Catts would clearly create an absurd result, which would create ambiguity.[53] Consequently, the BOA's decision should be given great weight and the reconstruction of Catts' building must comply with § 101-12(B)(2) height and elevation requirements. Furthermore, the town intended for Chapter 101 to apply. As mentioned in Catts' arguments above the amendments of Chapter 101 clearly point out the Towns intention for Chapter 101 or the most restrictive ordinance to apply in the event of conflict. In making this decision the Court has looked at both ordinances and read them as a whole.

---

[51] *4th Generation, Ltd.*, 1987 WL 14867 at *7.
[52] The Town of Dewey, Delaware, Municipal Code art. I, § 101-1.2(N).
[53] *Dir. Of Revenue*, 818 A. 2d at 175-76.

Finally, and hopefully without the risk of undue repetition, Catts' argument that the Town's interpretation of the ordinances would create surplusage fails to recognize that his interpretation would create an absurd result. Courts must ascribe a purpose to the use of language, if reasonably possible.[54] The interpretation that Catts proposes is not reasonable and would in fact create an absurd result and the Court has held that ordinances must be read in a way to avoid it.[55] Furthermore, Catts argument about *expressio unius est exclusio alterius* that the omission of commercial structures from § 185-59(A) completely ignores the fact that the residential structures language was added in response to *Laird*. The intention was not to exclude commercial structures from compliance with Chapter 101, but rather to ensure that residential structures were not built over or under a certain height.

## V.    CONCLUSION

This Court finds that the BOA's decision is supported by substantial evidence and is free from legal error. Accordingly, the decision of the BOA is **AFFIRMED.**

**IT IS SO ORDERED.**

---

[54] *Leatherbury*, 939 A. 2d at 1291.
[55] *Chase Alexa, LLC*, 991 A. 2d at 1152.